UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MUNNI ALI,

          Plaintiff,              Case No. 5:14-cv-13939
                                  Magistrate Judge Anthony P. Patti

v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND/OR REMAND (DE 11), GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 13)
and AFFIRMING THE DECISION OF THE COMMISSIONER OF
SOCIAL SECURITY**

**I.**    **OPINION**

Plaintiff, Munni Ali, brings this action under 42 U.S.C. § 1383(c) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for supplemental security income

benefits (SSIB).  The parties have consented to my authority (DE 15), and

this matter is before me for determination of Plaintiff's motion for summary

judgment and/or remand (DE 11), the Commissioner's cross-motion for

summary judgment (DE 13), and the administrative record (DE 8).

**A.**    **Background**

1

Plaintiff filed her application for SSIB on May 14, 2012, at twenty-one years of age, alleging that she has been disabled since January 1, 1993, at age one.  (R. at 123-128.)  According to her disability report, Plaintiff's ability to work is limited by a seizure disorder and polio at birth, specifically noting that she cannot hold with her left hand and cannot lift her leg.  (*See* R. at 141-148.)  On July 25, 2012, disability examiner Biancia Watson determined that Plaintiff was not disabled at the initial level.  The disability determination explanation included a physical RFC assessment by Tariq Mahmood, M.D.  (*See* R. at 82-91, 92; *see also* R. at 93-96.)

Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (*See* R. at 97-99.)  ALJ J. William Callahan held a hearing on May 1, 2013, at which Plaintiff was represented by attorney Mark Greenman and vocational expert (VE) Scott Silver testified.  (R. at 27-81.)[1]  On June 28, 2013, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act, § 1614(a)(3)(A).  (R. at 11-26.)[2]

Plaintiff requested review of the hearing decision.  (R. at 7-10, 175-178.)  On August 26, 2014, the Appeals Council denied Plaintiff's request

---

[1] *See also* R. at 100-102, 118-119, 122.

[2] *See* 42 U.S.C. § 1382c.

for review.  (R. at 1-6.)  Thus, ALJ Callahan's decision became the Commissioner's final decision.

Plaintiff timely commenced the instant action on October 13, 2014. (DE 1.)  The Commissioner filed an answer on December 19, 2014, along with a copy of the administrative record.  (DE 7, DE 8.)

### B.    Plaintiff's Medical History

Plaintiff alleges that she has been disabled since January 1, 1993, when she was approximately two months shy of her second birthday.  (R. at 123.)  Her medical records span the period of time from August 2009 to February 2013, when she was eighteen to nearly twenty-two years of age. (*See* R. at 180-222 (Exhibits 1F - 5F).)

Of particular significance to the issues before the Court are her neurological records.  For, example, on August 17, 2009, Plaintiff was seen by Randall R. Benson, M.D. of the Harper Neurology Clinic for evaluation of her seizures.  With respect to gait, Dr. Benson noted that Plaintiff was able to walk but had to lift her left foot while walking.  She was able to do tandem heel and toe with some difficulty.  Her muscle strength was 5/5 in the right upper and lower extremity.  However, on the left side, the upper proximal extremity was 4/5, the upper and distal extremities were 3/5, and the fingers distal were 3/5.  As for left-side reflexes, Dr. Benson noted

Plaintiff's biceps, triceps and brachial radialis were 1+, somewhat lesser than on the right side. He also noted that bulk was decreased on the left upper extremity. Dr. Benson sought to assess her carbamazepine level, as well as to obtain an electroencephalogram and MRI. (R. at 205-207.)

An August 31, 2009 Brain/Stem MRI revealed "[n]o acute intracranial process[,]" but also revealed "[a]n area of the encephalomalacia of the right frontal lobe adjacent to the right sylvian fissure representing old infarct." (R. at 211-212.) A September 3, 2009 EEG was abnormal, revealing waveforms that were not considered epileptiform in nature and a constellation of findings consistent with a possible structural lesion in the left hemisphere. (R. at 208-209.)

On January 8, 2011, Plaintiff was seen at Family Care Center, P.C., for a checkup.[3] It seems she was diagnosed with seizure disorder and acne vulgaris and prescribed Carbatrol[4] and benzoyl peroxide. (R. at 192.) Notes dated April 15, 2011, indicate that Plaintiff was undernourished / underweight. (R. at 195.) On November 15, 2011, Plaintiff was seen for blood work and a general checkup. Although difficult to read, the notes

---

[3] It appears that there are two Dr. Sharma's at Family Care Center, P.C. - Bhupesh Sharma, M.D., and Meenakshi Sharma, M.D. (R. at 193.)

[4] Carbatrol is used to treat certain types of seizures and nerve pain. *See* http://www.fda.gov/downloads/drugs/drugsafety/ucm241639.pdf.

4

indicate a hand deformity and seem to include diagnoses of hair loss, seizure disorder and polio.  (R. at 199.)

The July 9, 2012 consultative internal medicine report provided by Cynthia Shelby-Lane, M.D., notes, among other things, that Plaintiff "has a mild foot drop on the left with a limp on the left side[,]" includes impressions of seizure disorder and polio, and notes "slight difficulty with the use of her left side . . . ."  (R. at 182, 184.)  On the same date, Plaintiff had x-rays of the left humerus, the left radius and ulna, and the left hand.  (R. at 185.)  Range of motion was largely normal.  (R. at 186-187.)  A neurologic and orthopedic supplemental report did not indicate limitations on her current abilities (such as sitting, standing, bending, etc.), nor did it indicate abnormality in reflexes of the affected extremity.  (R. at 188.)  As to ambulation, the same report indicated that Plaintiff was able to walk on her heels and toes, was able to walk tandem, and her gait was stable and within normal limits.  Moreover,  clinical evidence did not support the need for walking aid.  (R. at 189.)  Grip strength was 42.1 on the right and 6.2 on the left.  (R. at 190.)

Notes from November 5, 2012, apparently by her treating physician, Dr. Bhupesh Sharma, note a left hand claw deformity among "abnormal exam findings."  (R. at 202.)  On February 25, 2013, Dr. Bhupesh Sharma

completed an RFC medical questionnaire, listing diagnoses of seizure disorder, something illegible, atopic dermatitis and polio of the left arm and leg.  Dr. Sharma left blank the question seeking signs, symptoms, and tests supporting his diagnoses.  (R. at 220.)  Still, he opined that Plaintiff could lift 10 pounds while working and could walk for approximately 30 minutes while performing occupational duties in an 8 hour day.  (R. at 220-221.) While Dr. Sharma opined that Plaintiff had limitations in the full use of her left hand due to the residuals from polio, he also opined that she could use the left hand occasionally and minimally.  (R. at 221.)  Also, he indicated that Plaintiff walks with a limp, due to weakness in her left leg.  (R. at 222.) Additionally, in SOAP (subjective, objective, assessment and plan) notes from the same date, Dr. Bhupesh Sharma diagnosed "other convulsions" and recorded acute poliomyelitis (affecting the left arm and the left leg).  (R. at 204.)

In addition, I note **(a)** a May 30, 2012 seizure form, which was signed and completed by Plaintiff's father, noting that Plaintiff's last seizure occurred on November 20, 2011 (R. at 149-152) and **(b)** a list of medications, seemingly dated April 4, 2013, which includes Carbatrol as an anticonvulsant and Cyproheptadine to help with weight gain.  (R. at 173, 170-172).  Further, when asked in her function report whether she suffered

from any medication related side effects, Plaintiff answered, "No."  (R. at 160.)

### C.      Hearing Testimony (May 1, 2013)

#### 1.      Plaintiff's Testimony

Plaintiff was 22 years old on the hearing date.  (R. at 31.)  She writes with her right hand.  (R. at 34.)  She is 5 feet 1 inch tall and weighs 78 pounds.  (R. at 57-58.)

As a child, Plaintiff underwent therapy at Children's Hospital for her left knee pain, but it did not help.  (R. at 37.)  She has not had any therapy in the last ten years.  (R. at 38.)  Plaintiff testified that, for 12 years, whenever she went to gym class, she just stood.  (R. at 52.)  She received her high school diploma in 2009 from Cleveland High School in Hamtramck, Michigan.  (R. at 31, 34.)  She did not have any special accommodations in high school.  (R. at 34.)  She was planning to attend Wayne State University, but did not go, because she "had the ride problem" and does not drive.  (R. at 32.)[5]  During 2011, she tried to ride a bike; however, she fell down.  (R. at 52.)

She has not applied for a driver's license, because she has a left hand and foot problem.  (R. at 33.)  According to Plaintiff, Dr. Sharma told her

---

[5] As it turns out, she was not admitted in any case, because she also has a " reading problem." (R. at 31.)

not to drive.  (R. at 34, 36.)  Plaintiff also testified that Dr. Sharma told her

not to walk much, because of her left knee pain which was caused by polio,

and "[n]ot to work much, like touch my left hand--with left hand."  (R. at

36-37.)  In other words, he told her not to use her left hand.  (R. at 37.)

Plaintiff stated that Dr. Sharma did not tell her there was anything else she

should not do.  (*Id.*)   Additionally, Plaintiff testified that, if she walks too

much, it bothers her knee and her toes swell; generally, she can walk a block

or less before she has to stop.  (R. at 53-54.)  Plaintiff explained that she has

problems standing up, due to her left knee pain.  (R. at 37.)  The pain in her

left knee is helped when her mother massages her left foot.  (R. at 38.)

Plaintiff lives with eight people, including her mother, father and five

siblings.  (R. at 34-35.)  Her father prepares her food.  (R. at 45.)  Her

mother helps her get dressed, as it hurts her left hand to get dressed by

herself.  (R. at 49, 55.)  Her siblings change the television channel for her.

(R. at 49-50.)

During the day, she watches television, lying down, because it is the

most comfortable position for her.  (R. at 40, 45.)  She testified there is no

reason why she could not sit up while watching television, but could not do

so for 11 hours, because sitting in a chair causes knee pain, and

acknowledged that she was not having any problems sitting in the chair for

the administrative hearing, other than the fact that her knee was hurting.  (R. at 37, 45-46.)  According to Plaintiff, it helps to raise her left foot off of the floor and put it on a small stool, elevated about ten inches.  (R. at 47.)  She might leave the house to go to the mall, but her parents drive her and stay with her.  (R. at 50-51.)  She testified that on the previous Sunday she was at the mall for one hour.  (R. at 52.)  While she initially testified that she walked around the whole hour, she later estimated that she stood for 20 minutes, walked for 20 minutes and sat down for 20 minutes.  (R. at 53-54.)

There is nothing wrong with Plaintiff's right arm and hand, and she agrees that her right hand is "fine."  (R. at 47, 49.)  Her arm and knee problems are all on the left side, and her left arm, left leg and left knee problems have been the same for 22 years.  (R. at 51; *see also* R. at 56.)  She testified that she can lift 10 pounds with just her right hand, but she cannot lift anything with her left hand alone.  (R. at 48.)[6]

Plaintiff testified that she cannot type, but she can get on a computer. (R. at 55.)  If using a computer, she could get onto the internet with her right hand.  (R. at 55; *see also* R. at 58.)  She has had an email address since 2009,

---

[6] In her function report, Plaintiff states she can only utilize her right hand. (R. at 153.)  In her disability report she also represented that she "cannot hold with left hand."  (R. at 142.)

when she graduated high school, and uses it to communicate with her best friend.  (R. at 58-59.)

Plaintiff testified that she takes Carbatrol two times per day – at 2:00 p.m. and 11:00 p.m.  (R. at 56-57.)  Carbatrol makes her sleepy.  (R. at 41, 57.)  She normally goes to bed at 11:00 p.m. and gets out of bed at noon, and may sleep until 7:00 p.m. following her afternoon dose.  (R. at 56-57.) Plaintiff testified that her last seizure occurred in 2011, for which she received treatment at Detroit Receiving Hospital.  (R. at 42.)

### 2. Vocational Expert Testimony

VE Scott Silver testified.  (R. at 60-81.)  As to the first hypothetical, which assumed an individual of Plaintiff's age and education with no relevant work and no skills but with an RFC having approximately thirteen (13) different limitations, the VE testified that such an individual could perform work as a surveillance monitor (excluding Homeland Security and gaming institutions) for which there are 2,500 jobs in Michigan, 1,000 in the tri-county area and 91,000 nationally.  (R. at 61-62.)

The ALJ also asked the VE a host of other questions and hypotheticals.  (R. at 62-81.)  In particular, I note the VE's testimony that needing to take breaks, such that the maximum an individual would be available to work would be six hours per day, would be preclusive for full-

time employment.  (R. at 65.)  In addition, the VE testified that needing to take anti-convulsive medication and having to fall asleep right away for five hours would be employment preclusive.  (R. at 65-66.)  Also, the VE testified that completely eliminating use of the left hand for any activity, such as no longer having the arm, would preclude the jobs, although he also stated that limiting the use of the left upper extremity to "not at all" would not change the number of jobs available, seemingly a contradiction.  (R. at 80-81, 63.)

### D.    The Administrative Decision (June 28, 2013)[7]

---

[7] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?
    2.    Does the claimant suffer from one or more severe impairments?
    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
    5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

On June 28, 2013, ALJ Callahan issued his decision.  (R. at 11-26.) In so doing, he used the amended onset date of January 1, 2012, as requested by Plaintiff in her April 4, 2013 hearing memorandum.  (R. at 170-172.)

At Step 1 of the sequential evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 1, 2012.  (R. at 16.)

At Step 2, the ALJ found that Plaintiff has the following severe impairments:  poliomyelitis with limited use of the left upper and lower extremity and seizure disorder.  (R. at 16.)

At Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of listing 1.02 ("Major dysfunction of a joint(s) (due to any cause)") or any other listed impairment.  (R. at 16.)

At Step 4, the ALJ found that Plaintiff has the residual functional capacity (RFC) to perform sedentary work, except for these 13 limitations:

- lift or carry five pounds frequently and 10 pounds occasionally with the dominant [right] upper extremity and three pounds with the non-dominant [left] upper extremity;

- stand or walk from 20 minutes at a time up to one half hour at a time and up to two hours per day;

- does not require an assistive device when walking;

- no limitations on sitting, pushing or pulling except within the above limits on lifting or carrying and a maximum of pushing or pulling of three pounds on the left;

- unable to operate foot controls with the left lower extremity;

- occasional climbing of ramps and stairs;

- occasional balancing, stooping, kneeling, crouching or crawling;

- able to kneel except no kneeling where the claimant is expected to rise using her left leg;

- no climbing ladders, ropes or scaffolds;

- limited handling with the non-dominant left upper extremity and hand to occasionally;

- unlimited handling, fingering or feeling with the dominant right upper extremity and reaching in all directions with either upper extremity, but subject to weight limits of three pounds on the left and 10 pounds occasionally on the right or five pounds frequently on the right;

- no limits on handling or fingering on the right; and

- no visual or communicative or environmental limitations except that she cannot be exposed to unprotected heights, sharp surfaces or objects, fast moving, heavy machinery or driving.

(R. at 16-21.)  Also, the ALJ found that Plaintiff has no past relevant work.

(R. at 21.)

At Step 5, considering the Plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (R. at 21-22.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d

14

506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the

ALJ, and not the reviewing court, to evaluate the credibility of witnesses,

including that of the claimant."). Furthermore, the claimant "has the

ultimate burden to establish an entitlement to benefits by proving the

existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.

1990).

Although the substantial evidence standard is deferential, it is not

trivial. The Court must "'take into account whatever in the record fairly

detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v.*

*NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp.*

*v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence

supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite

conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting

*Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. §

405(g) ("The findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive . . . ."). Finally,

even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the

merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at

651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.

2007)).

### F.   Analysis

Within the argument portion of her motion for summary judgment

and/or remand, Plaintiff asserts the following statements of error:

1.   The ALJ did not properly assess the Plaintiff's credibility and limitations with respect to the use of her left hand and the side effects of her medication.

2.   The ALJ failed to assess whether Plaintiff's medical condition met or equaled Listing 1.11 (anterior poliomyelitis) – including Listing 11.04B's "[s]ignificant and persistent disorganization of motor function in two extremities," - and also failed to assess Plaintiff's post-polio sequelae as outlined in Social Security Ruling 03-1p.

3.   The ALJ did not give proper weight to the medical opinions of Dr. Sharma, the Plaintiff's treating and examining physician.

4.   The ALJ did not pose complete and accurate hypothetical questions to the VE.

(DE 11 at 14-28.)[8]

---

[8] Plaintiff's motion listed six statements of error. (DE 11 at 1-2.) Plaintiff's brief lists four questions presented. (DE 11 at 8.) However, Plaintiff's argument contains three bold faced arguments, some aspects of which are never actually addressed, *e.g.*, Plaintiff's general credibility. (DE 11 at 14, 20.) These discrepancies make it unnecessarily difficult to understand what is at issue in this appeal and what is not; however, issues which are not adequately developed and supported are deemed waived. *Straws v. Berghuis*, No. 2:08 CV 10481, 2010 WL 420018, at *1 (E.D. Mich. Jan. 28,

The Commissioner opposes Plaintiff's motion, asserting that (1) the ALJ properly evaluated the credibility of Plaintiff's allegations about weakness and medication side effects; (2) the ALJ properly evaluated the opinion provided by Plaintiff's treating physician, Dr. Sharma; (3) the ALJ was not required to discuss whether Plaintiff's condition satisfied the requirements of Listing 11.04B; and (4) the ALJ properly relied on the VE testimony. (DE 13 at 12-27.)

I will address each argument in turn.

### 1.    The ALJ properly assessed Plaintiff's credibility.

In his June 28, 2013 decision, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not entirely credible . . . ." (R. at 18.) In doing so, the ALJ first took note of Dr. Bensons's August 17, 2009 report that

---

2010) ("Generally, issues which are not adequately developed in a brief are deemed waived.") (citing *Rojem v. Gibson,* 245 F.3d 1130, 1141, n.8 (10th Cir.2001)). Plaintiff's counsel is reminded that "[a] brief supporting a motion or response must, at the beginning, contain a concise statement of the issues presented and, on the following page, the controlling or most appropriate authority for the relief sought." E.D. Mich. LR 7.1(d)(2) ("Form of Required Briefs."). Moreover, the argument section of the brief should be clearly sub-divided into the number of arguments addressed, which should conform to the issues presented at the beginning of the brief, as now required by the Undersigned's Practice Guidelines on Social Security briefing. Finally, as Plaintiff's brief makes use of various line spacing, counsel's attention is further directed to E.D. Mich. LR 5.1(a)(2) ("Format."). (*See*, *i.e.*, DE 11 at 18, 24, 25, 26.)

Plaintiff "just finished high school and [was] planning to attend Wayne State University." (R. at 18, 206.) Second, the ALJ noted a discrepancy regarding the date of Plaintiff's last seizure. (R. at 18.) For example, the May 30, 2012 seizure questionnaire completed by Plaintiff's father listed her last seizure as occurring on November 20, 2011. (R. at 149.) Consistently, at the May 1, 2013 hearing, Plaintiff testified that her last seizure occurred in 2011. (R. at 42.) However, Dr. Shelby-Lane's July 9, 2012 report notes that Plaintiff "states that she has not had a seizure since 2009." (R. at 182.)[9] Third, the ALJ observed, "[t]he claimant claims that the medications cause drowsiness and sleepiness but there is no mention of this in the medical reports." (R. at 18.) Fourth, the ALJ found Plaintiff's claims about limitations in fine and gross manipulation unsupported by Dr. Sharma's February 25, 2013 RFC Medical Questionnaire and then pointed to what appears to be Dr. Sharma's November 5, 2012 observation of a left hand claw deformity. (R. at 19, 220-222, 202.) For purposes of discounting Plaintiff's credibility *generally*, this would appear to be more than adequate.

Notwithstanding this, Plaintiff attacks the ALJ's credibility determination on two specific points. First, she argues that the ALJ "failed

---

[9] In addition, I note that Dr. Sharma's record of her January 8, 2011 check-up references a chief complaint of acne and her last seizure as having occurred a "long time ago . . . ." (R. at 192).

to assess" her ability to grasp, pick up objects, and use her left hand. (DE 11 at 1-2, 8, 14-15, 18-19; *see also* DE 13 at 12.)  Second, she argues that the ALJ gave improper weight to her testimony that her medication caused drowsiness.  (DE 11 at 14, 19-20; *see also* DE 13 at 12.)

### a.     The ALJ adequately considered Plaintiff's ability to use her left hand.

In arguing that the ALJ failed to give adequate consideration to Plaintiff's left upper extremity disabilities, Plaintiff points, *inter alia*, to Dr. Benson's August 17, 2009 notes regarding reduced left-side reflexes and decreased bulk on the left upper extremity, Dr. Sharma's November 15, 2011 notes about left hand deformity, Dr. Sharma's November 5, 2012 notes regarding claw deformity, and Dr. Sharma's February 25, 2013 assessment about left hand limitations.  (DE 11 at 13-15, R. at 206, 199, 202, 221.)

The ALJ acknowledged the post-seizure dizziness or weakness and muscle soreness indicated on the May 30, 2012 seizure form, as well as Dr. Shelby-Lane's July 9, 2012 notations of left-side weakness.  (R. at 18-19, 21; *see also* R. at 149, 183-184.)  The ALJ also acknowledged Dr. Sharma's November 5, 2012 finding of a left hand claw deformity and February 25, 2013 opinion that Plaintiff could occasionally (1/3 of the time) use her hand for occupational duties, including repetitive grasping, holding, and pinching. (R. at 19, 202, 221.)  Furthermore, the ALJ acknowledged Plaintiff's

counsel's April 4, 2013 assertion that Plaintiff "has an inability to perform fine and gross manipulation effectively (1.02 (B)) with her left upper extremity." (R. at 16, 172.) In addition, the ALJ acknowledged Interviewer T. Kouba's May 14, 2012 observation that Plaintiff did not have difficulty with using hands or writing. (R. at 21, 138-140.) The ALJ also acknowledged Dr. Shelby-Lane's July 9, 2012 note that Plaintiff had "slight difficulty with the use of her left side because of weakness and a limp on that side and left foot drop." (R. at 19, 21, 184.) In light of all these considerations, there was substantial evidence to support the ALJ's decision to discount the Plaintiff's credibility with respect to her claimed limitations. Contrary to Plaintiff's portrayal, this same evidence supplied an adequate basis for the ALJ to find that Plaintiff was not completely disabled from using her left hand/extremity and to fashion the RFC that he ultimately adopted.

**b.     The ALJ adequately considered the side effects of Plaintiff's medication.**

Plaintiff also argues that the ALJ gave improper weight to her testimony that her Carbatrol medication caused "extreme fatigue and drowsiness," which she testified to be an immediate reaction. (DE 11 at 12, 14, 19, 20, 41, 57.) However, as noted above, the ALJ observed in his written decision that Plaintiff "claims that the medications cause drowsiness

and sleepiness *but there is no mention of this in the medical reports*." (R. at 18; *see also* R. at 41, 44 and 57) (emphasis added). Here, Plaintiff refers to the Physician's Desk Reference, which lists possible side effects of Carbatrol as including "dizziness, drowsiness, aching joints, muscle and leg cramps[.]" (DE 11 at 19-20, 31.) However, as the Commissioner points out, Plaintiff's undated function report admits that while she currently takes medicines, *they do not cause side effects*. (R. at 160, DE 13 at 14.) Furthermore, the record shows that Plaintiff has been taking Carbatrol since she was eight years old, yet was able to attend and complete high school without any special accommodations. (R. at 31, 34, 57, 205.) Moreover, she was dissuaded from attending college because of a "ride problem" and/or a "reading problem." (R. at 31-32.) The record is thus replete with reasons for discounting Plaintiff's testimony as to the debilitating effects of Carbatrol, both expressed and unexpressed, and any failure by the ALJ to mention them is harmless, this Court being convinced that a remand on this issue would not change the ultimate outcome. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("harmless error analysis applies to credibility determinations in the social security disability context.").

## 2.   The ALJ properly weighed the opinion evidence.

Plaintiff challenges the ALJ's assessment of treating physician Dr. Sharma's opinions and also challenges whether the ALJ should have contacted Dr. Sharma to clarify treatment notes and complete the RFC Medical Questionnaire form, instead of discounting it, in accordance with 20 C.F.R. § 404.1512(e)(1).  (DE 11 at 15-18.)

### a.    The ALJ's Standard of Review

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR § 404.1527(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may

bring a unique perspective to the medical evidence that cannot be obtained

from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2);

*Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  To

qualify as a treating source, the physician must have an "ongoing treatment

relationship" with the claimant.  20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's

opinion, the ALJ must meet certain procedural requirements.  *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an

ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the opinion,
> consistency of the opinion with the record as a whole, and the
> specialization of the treating source—in determining what weight to
> give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's]

notice of determination or decision for the weight [the ALJ] give[s] your

treating source's opinion."  20 C.F.R. § 416.927(d)(2).  Accordingly, the

ALJ's reasoning "must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc.*

*Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal

quotation omitted).  The United States Court of Appeals for the Sixth Circuit

has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let
> claimants understand the disposition of their cases," particularly
> in situations where a claimant knows that his physician has
> deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she
> is not, unless some reason for the agency's decision is
> supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The
> requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's
> application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28,
> 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is

"particularly important when the treating physician has diagnosed the

claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F.

App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

### b. The ALJ's Analysis of the Medical Record and Opinion Evidence

Within his June 28, 2013 Step 4 RFC determination, the ALJ assigned

weight to certain records.  Among these was the ALJ's assignment of little

weight to Dr. Bhupesh Sharma's February 25, 2013 RFC medical

questionnaire (R. at 19, 220), great weight to Dr. Shelby-Lane's July 9, 2012

assessment (R. at 19-21, 182-184), and great weight to the July 25, 2012

assessment of Dr. Tariq Mahmood (R. at 20-21, 87-89).

i.   **The ALJ Properly Discounted Dr. Sharma's Opinion.**

In his June 28, 2013 decision, the ALJ expressly states that he considered opinion evidence in accordance with the requirements of 20 C.F.R. § 416.927.  (R at 17.)   As the Sixth Circuit has instructed:

> As to the RFC or medical condition, an ALJ may only choose not to give a treating physician's opinion controlling weight if she gives "*good reasons* ... for the weight give[n]," 20 C.F.R. § 404.1527(d)(2) (now in 20 C.F.R. § 404.1527(c)(2)), and if those reasons are "*supported by the evidence* in the case record, and [are] *sufficiently specific* to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," SSR 96–2p, 1996 WL 374188, at *5 (1996). If the ALJ decides not to give a treating physician's opinion controlling weight, the ALJ may not reject the opinion, but *must apply other factors* to determine what weight to give the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source[.]" *Wilson,* 378 F.3d at 544 (citing § 404.1527(d)(2), now in § 404.1527(c)(2)).

*Gentry v. Commissioner of Social Sec.*, 741 F.3d 708, 727 (6th Cir. 2014) (emphasis added).

Here, in assigning little weight to Dr. Sharma's February 25, 2013 opinion, the ALJ has provided good reasons which are supported by the evidence and are sufficiently specific.  (*See* R. at 19, 220-222.)  For example, the ALJ noted that Dr. Sharma's February 25, 2013 "RFC Medical

25

Questionnaire" indicates that Plaintiff can occasionally use her left hand for repetitive grasping, holding, and pinching, in contrast to her counsel's April 4, 2013 argument that "she is very limited in both fine and gross manipulation." (R. at 19, 171, 221.) In addition, the ALJ pointed out that Dr. Sharma's November 5, 2012 notes observed a left hand claw deformity. (R. at 19, R. at 202.) More importantly, the ALJ noted that Dr. Sharma diagnosed seizure disorder, something illegible, atopic dermatitis, and polio of the left arm and leg, but left blank the crucial, supporting Question 3, which reads, "**Please advise as to the signs, symptoms, and tests that support the diagnoses.**" (R. 19, 220 (emphasis added).) As the ALJ explained, "[s]ince this document is rendered unreliable by the incomplete answer 3, the undersigned, therefore, assigns little weight to this . . . opinion." (R. at 19.) "The opinions and diagnoses of treating physicians are entitled to deference, but they are not entitled to complete deference and thus are not controlling if inconsistent with other substantial evidence *or unsupported by detailed objective criteria and documentation*." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 276 (6th Cir. 2002) (emphasis added) (citations omitted).

To the extent Plaintiff argues that the ALJ "had a duty to recontact the claimant's medical sources[,]" (*see* DE 11 at 15-17), the Commissioner

26

correctly points out that 20 C.F.R. §§ 404.1512(d) and 416.912(e) no longer

contain a provision about re-contacting medical sources, and the regulation

governing the consideration of evidence now provides, in pertinent part:

> We *may* recontact your treating physician, psychologist, or
> other medical source.  We *may* choose not to seek additional
> evidence or clarification from a medical source if we know
> from experience that the source either cannot or will not
> provide the necessary evidence.

20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1) (emphases added).  (DE 13 at

20-21.)  In other words, "ALJs now have discretion to decide whether to

recontact."  *Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133,

at *23 (E.D. Mich. Jan. 27, 2015) (Friedman, J., adopting report and

recommendation of Morris, M.J.) (citing 20 C.F.R. §§ 404.1520b(c),

416.920b(c)).

Here, the ALJ was well within his authority to assign little weight to

Dr. Sharma's opinion, and well within his discretion to refrain from

recontacting him.  This is particularly so in light of the other medical

evidence and opinions he had available to him.

### ii.   The ALJ Properly Considered the Other Medical Opinions and the Record as a Whole.

Furthermore, the medical record contains assessments of Plaintiff's

medical conditions and ability to work by other doctors.  For example, the

ALJ assigned great weight to the July 9, 2012 opinion of consultative

examiner Dr. Shelby-Lane.  (R. at 19-21, 182-184.)  Dr. Shelby-Lane's

medical source statement reads as follows:

> Based upon the history and the exam, the examinee is of very
> small stature.  She is taking Periactin to help with her weight.
> She does have slight difficulty with the use of her left side
> because of weakness and a limp on that side and left foot drop.
> The examinee would have difficulty *due to her small stature*
> with lifting, pushing and pulling heavy loads.  She does not do
> that in general.  She should avoid operating foot and leg
> controls and motorized equipment because of the history of
> seizures.

(R. at 184) (emphasis added).  The ALJ found that this report "spells out in

greater detail and extent the medical problems and the limitations on the

claimant's ability to perform gainful activity."  (R. at 20.)

　　　　Also, the ALJ assigned great weight to the July 25, 2012 physical

RFC assessment of State agency physician Tariq Mahmood, M.D., which set

forth:  (1) *exertional limitations* (occasional lifting and/or carrying of 10

pounds, frequent lifting and/or carrying of less than 10 pounds, standing

and/or waking for a total of 2 hours, sitting for a total of approximately 6

hours in an 8-hour workday, and limitations on pushing and/or pulling in the

left upper and lower extremities); (2) *postural limitations* (occasional

climbing ramps/stairs, climbing ladders/ropes/scaffolds, balancing, stooping,

kneeling, crouching, and crawling); (3) *manipulative limitations* (limited in

handling (gross manipulation) with the left); and (4) *environmental limitations* (avoiding all exposure to hazards), but *no visual or communicative limitations*.  (R. at 20-21, 87-89.)  With regard to the assessment of vocational factors, the ALJ demonstrated independent judgment by noting that Dr. Mahmood should have relied on the framework of Medical-Vocational Rule 201.27, rather than 201.29.  (R. at 20, 89-90.) Also, the ALJ noted that Dr. Mahmood's assessment pre-dates Plaintiff's hearing testimony.  (R. at 20, 31-60.)  Nonetheless, the ALJ found that Plaintiff's testimony "did not add any additional factors, which would limit the [RFC], as determined by Dr. Mahmood . . . ."  (R. at 20.)

Thus, the Court concludes that the ALJ appropriately weighed the opinion evidence in this case and considered the record as a whole.

### 3. The ALJ's failure at Step 3 to expressly address whether Plaintiff's condition met or equaled Listing 11.11 / post-polio sequelae as outlined in SSR 03-1p was harmless.

Plaintiff argues that the ALJ did not assess her postpolio sequelae in accordance with SSR 03-1p, which concerns "DEVELOPMENT AND EVALUATION OF DISABILITY CLAIMS INVOLVING POSTPOLIO SEQUELAE."  DE 11 at 18-19.  This regulation includes consideration of whether the postpolio sequelae impairment meets or equals listing 11.11:

> The listing criteria under our current listing 11.11, *Anterior poliomyelitis*, may be applied both to cases of static polio (where there has been no reported worsening after initial recovery) and to cases presenting with postpolio sequelae. All documented postpolio sequelae must be considered either alone or in combination to determine whether the medical criteria of listing 11.11, or any other listing, have been met or equaled. If the impairment is not found to meet or equal a listed impairment, we consider the impact of the impairment and any related symptoms in determining an individual's RFC and we proceed to evaluate the individual's impairment under our sequential evaluation procedures in accordance with 20 CFR 404.1545 and 416.945. It is essential that the cumulative and interactive effects of all of the individual's impairments, including symptoms, be carefully assessed in determining the individual's RFC in these cases.

SSR 03-1p (emphasis added). Listing 11.11 for anterior poliomyelitis requires (A) "[p]ersistent difficulty with swallowing or breathing;" or (B) "[u]nintelligible speech;" or (C) "[d]isorganization of motor function as described in 11.04B." Listing 11.04B requires ***"[s]ignificant and persistent disorganization of motor function*** in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station . . . ." *Id.* (emphasis added).

Plaintiff argues that she satisfies 11.04B "in the left upper extremity and hand." (DE 11 at 18.) Here, she particularly cites Dr. Shelby-Lane's assessment, which notes that Plaintiff "has weakness against resistance in the left upper and left lower extremity and a left foot drop with a limp on the left side." (R. 183.) Plaintiff also seemingly points to Dr. Sharma's

30

February 25, 2013 RFC assessment that Plaintiff can stand approximately

one hour and walk approximately ½ hour in an eight hour day.  (R. at 220-

222.)  Moreover, Plaintiff points to her testimony about her left knee pain

and her left foot.  (R. at 36-37, 38-39, 47.)  Therefore, it seems as if Plaintiff

may also be arguing that she satisfies 11.04B in her left lower extremity,

although this is unclear, as it is not specifically argued as satisfying the

listing criteria.

On the other hand, the Commissioner argues that the ALJ "was not

required to discuss whether Plaintiff's condition satisfied the requirements of

Listing 11.04B[,]" as "the evidence shows that the Listing cannot be met."

(DE 13 at 21-23.)  The Commissioner contends that "persistent

disorganization of motor function" requires:

> **paresis or paralysis, tremor or other involuntary movements,**
> **ataxia and sensory disturbances** (any or all of which may be
> due to cerebral, cerebellar, brain stem, spinal cord, or peripheral
> nerve dysfunction) which occur singly or in various
> combinations, [and which] frequently provides the sole or
> partial basis for decision in cases of neurological impairment.
> The assessment of impairment depends on the degree of
> interference with locomotion and/or interference with the use of
> fingers, hands, and arms.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).[10]

---

[10] Paresis is "[p]artial or incomplete paralysis."  Stedman's Medical
Dictionary 653770 (Nov. 2014).

31

Presumably referring to Dr. Shelby-Lane's description of Plaintiff's history of polio "with some mild weakness on the left side with a limp on the left side and a foot drop on the left lower extremity[,]" the Commissioner contends that Plaintiff "does not have paresis, paralysis, tremor, involuntary movement, ataxia, or sensory disturbance, as required by the Listing." (DE 13 at 22, R. at 184.) This appears to be accurate. Plaintiff points to no medical records or credited opinions which mention paresis, paralysis, tremor, other involuntary movements, ataxia or sensory disturbances.

Significantly, Dr. Shelby-Lane's July 9, 2012 *neurologic exam* described Plaintiff's *sensory functions* as "[n]o abnormalities noted, and intact to gross testing[,]" and the *motor exam*, which the ALJ expressly acknowledged at Step 4, as "[r]eveal[ing] fair muscle tone without evidence of flaccidity, spasticity or paralysis." (R. at 19, 183-184.) Furthermore, Dr. Shelby-Lane's finding that Plaintiff could walk on heels and toes and tandem, and that her gait was "stable and within normal limits" would be inconsistent with ataxia. (R. at 189.)[11] Moreover, on several occasions

---

[11] "Ataxia often occurs when parts of the nervous system that control movement are damaged. People with ataxia experience a failure of muscle control in their arms and legs, resulting in a lack of balance and coordination or a disturbance of gait. While the term ataxia is primarily used to describe this set of symptoms, it is sometimes also used to refer to a family of disorders. It is not, however, a specific diagnosis." *See*

during 2011, it appears Dr. Sharma likewise assessed "no focal sensory deficits."  (R. at 196, 199, 200.)

"[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  Plaintiff has not shown that she meets the definition of "persistent disorganization of motor function," 20 C.F.R. § Pt. 404, Subpt. P, App. 1, and the Commissioner has offered reasons why the ALJ's failure to expressly address Listing 1.11 – namely that Plaintiff cannot meet the definition of "persistent disorganization of motor function" - is harmless.  *McMillan v. Comm'r of Soc. Sec.*, No. 1:10-CV-308, 2011 WL 6997635, at *6 (W.D. Mich. Sept. 26, 2011), *report and recommendation adopted as modified*, No. 1:10-CV-00308, 2012 WL 90264 (W.D. Mich. Jan. 11, 2012) ("The ALJ's lack of clarity is, at most, harmless error, because the ALJ's finding that plaintiff did not meet or equal the requirements of listing 12.05's diagnostic description is supported by more than substantial evidence, and it was plaintiff's burden to demonstrate that she met or equaled *all* parts of the listing."); *see also West v. Commissioner of Soc. Sec. Admin.*, 240 F.App'x 692, 698 (6th Cir. 2007) (with regard to Listing 12.05(C), "[s]ubstantial evidence supports the ALJ's

---

http://www.ninds.nih.gov/disorders/ataxia/ataxia.htm (last visited Mar. 8, 2016).

conclusion that West did not experience deficiencies in adaptive

functioning.").

Likewise, Plaintiff's postpolio sequelae argument under SSR 03-1p is

without merit.  (DE 13 at 22 n.3).  According to the National Institute of

Neurological Disorders and Stroke (NINDS):

> . . . *postpolio syndrome is a condition that affects polio survivors anywhere from 10 to 40 years after recovery from an initial paralytic attack of the poliomyelitis virus*. The NINDS states that postpolio syndrome *is characterized by a **further weakening** of muscles that were previously affected by the polio infection*. The signs and symptoms include fatigue, slowly ***progressive*** muscle weakness, and, at times, muscular ***atrophy***. The NINDS states that joint pain and increasing skeletal deformities such as scoliosis are common. Not all polio survivors experience these clinical problems, and the extent to which polio survivors are affected by postpolio syndrome varies. ***The onset of new or worsening signs and symptoms*** is associated with a further reduction of the individual's capacity to independently carry out activities of daily living.

*Policy Interpretation Ruling Titles II & Xvi: Dev. & Evaluation of Disability*

*Claims Involving Postpolio Sequelae*, SSR 03-1P (S.S.A. July 2, 2003)

(emphases added).  Here, there is no indication the Plaintiff's condition has

worsened over time or of a further weakening; in fact, she testified that the

problem with her left arm, left leg and left knee has been the same for 22

years.  (R. at 51.)

### 4.    Plaintiff's Step 5 arguments are unavailing.

#### a.    The accuracy of the hypothetical

Plaintiff also makes several Step 5 arguments. (*See* DE 11 at 20-28.) First, she challenges the accuracy of the hypothetical posed to the VE. As noted above, the ALJ's Step 4 RFC determination specified, among other limitations, "limited handling with the non-dominant *left upper extremity and hand* to occasionally[,]" compared to "unlimited handling, fingering or feeling with the dominant *right upper extremity* . . . .[,]" "reaching in all directions with *either upper extremity*," and "no limits on handling or fingering *on the right*[.]" (R. at 17 (emphasis added).) Similar conditions were part of his hypothetical to the VE. (*See* R. at 62, 76.)[12]

Plaintiff argues that the ALJ's hypothetical does not take into consideration her ability to manipulate her fingers and her "testimony about her inability to grasp and to make a fist[,]" in other words, her "significant limitation with regard to fingering, handling or grasping[,]" or feeling. (*See* DE 11 at 21-22, 27-28.) However, to the extent this argument is based upon Plaintiff's testimony or Dr. Sharma's February 25, 2013 RFC medical questionnaire, the ALJ's credibility assessment and treatment of Dr.

---

[12] The regulation which discusses physical exertion requirements does not address "reaching." However, it states, in part: "Sedentary work involves lifting no more than 10 pounds at a time and ***occasionally*** lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required ***occasionally*** and other sedentary criteria are met." 20 CFR § 404.1567(a)(emphasis added).

Sharma's opinion have been addressed above.  In other words, as the

Commissioner suggests, Plaintiff is advocating that there should have been

"a complete prohibition on the use of her left arm[.]"  (DE 13 at 24-25.)

However, this argument was appropriately rejected as being without

credible, objective record support.  Contrary to the arguments asserted here,

the ALJ appears to have carefully crafted an RFC and related hypothetical

which reflect the Claimant's actual impairments and which are substantially

supported by the record as a whole.

> **b.      Whether a significant number of jobs satisfying the RFC exists**

Second, Plaintiff argues that 400 surveillance monitor jobs in the

entire State of Michigan do not constitute a significant number.  (DE 11 at

22-23, 26-27.)  In his Step 5 analysis, the ALJ noted that an accommodation

for one-handed work reduced the number of jobs available from 91,000 to

30,000 jobs nationally, from 2,500 to 400 jobs in the State of Michigan, and

from 1,000 to 200 jobs in the tri-county area.  (R. at 22.)  Although the VE

sometimes made use of the term "employers" instead of the term "jobs,"

these numbers align with the VE's testimony.  (R. at 62-63, 77-80.).

Certainly, the Sixth Circuit has acknowledged the difficulty of defining a

*significant number*:

We are not blind, however, to the difficult task of enumerating exactly what constitutes a "significant number."  We know that we cannot set forth one special number which is to be the boundary between a "significant number" and an insignificant number of jobs.  The figure that the ALJ here found is *not* that magic number; the 1350 figure is to be viewed in the context of this case only.  A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Hall v. Bowen*, 837 F.2d 272, 273-275 (6th Cir. 1988); *see also Martin v. Comm'r of Soc. Sec.*, 170 F.App'x 369, 375 (6th Cir. 2006) ("While there are only 107,826 assembler jobs in the United States, 870 of the jobs are concentrated in Martin's geographic region. Contrary to Martin's position, 870 jobs can constitute a significant number in the geographic region."), *Stewart v. Sullivan*, 904 F.2d 708 (6th Cir. 1990) ("Given the total number of jobs available in Floyd and Pike Counties, we hold that 125 relevant jobs can be a significant number of jobs in that region.  . . . Certainly, 400,000 jobs, with no indication of gross concentration in a few areas, is a significant number of jobs in the national economy.").

In the case at bar, the Court need not determine whether 400 jobs in the State of Michigan constitutes a significant number, because, for the

reasons stated above, substantial evidence supports the ALJ's RFC as to the left upper extremity.  The record evidence does not establish that Plaintiff is one-handed.  Dr. Sharma, a treating physician, observed a left hand claw deformity and opined that despite *limitations* in the full use of her left hand, she could use it occasionally (1/3 of the time) (R. at 202, 221).  Dr. Shelby-Lane noted not a complete inability to use her left hand, but rather, a "weakness against resistance in the left upper . . . extremity . . . ." (R. at 183.)  Moreover, Plaintiff herself testified that she tried to ride a bike in 2011, although she fell down, and further testified that she did not have to have any special accommodations in high school.  (R. at 32-34, 39, 52.)  In addition, the ALJ acknowledged Interviewer T. Kouba's May 14, 2012 observation that Plaintiff did not have difficulty with using hand(s) or writing.  (R. at 21, 139.) Therefore, since the ALJ's determination that Plaintiff did not need an accommodation for her left hand beyond that described in the RFC is supported by substantial evidence, the VE's testimony about 91,000 surveillance monitor jobs nationally, 2,500 statewide and 1,000 in the tri-county area would apply.  (R. at 62; *see also* R. at 66-68, 72-76.)  These numbers are "significant."

Finally, even if, *arguendo*, this Court found that Plaintiff was one-handed or could not use her left hand *at all*, the VE's testimony supports a

38

conclusion that there were a significant number of jobs.  In this case, the VE

testified that an accommodation for a one-handed keyboard would reduce

the numbers to 200 employers in the tri-county area, 400 employers in the

State of Michigan and 30,000 jobs nationally.  (R. at 77-79.)  *See Stewart v.*

*Sullivan*, 904 F.2d 708 (6th Cir. 1990) ("Given the total number of jobs

available in Floyd and Pike Counties, we hold that 125 relevant jobs can be a

significant number of jobs in that region.  . . . Certainly, 400,000 jobs, with

no indication of gross concentration in a few areas, is a significant number

of jobs in the national economy.").  Here, even without having to consider

whether 400 employers in the State of Michigan constitute a significant

number, the Court has no trouble finding that 200 employers in the tri-

county area and 30,000 jobs nationally do.

### c.     Whether the VE's testimony trumped the DOT

Third, Plaintiff argues that the VE's testimony regarding the existence

of one-handed surveillance system monitor occupations "fails to trump the

DOT language that lists them as requiring two hands."  (DE 11 at 24.)  She

takes issue with the VE's reliance upon his "experience in the labor market"

and his personal observation of the job in question (R. at 66-69), arguing that

"[t]he job[] was only observed once, for about one hour, during a slow

39

time." (DE 11 at 22-27.) In other words, Plaintiff asserts this job requires

"bilateral keyboard operation." (DE 11 at 28.)

"When a VE or VS provides evidence about the requirements of a job

or occupation, the adjudicator has an affirmative responsibility to ask about

any possible conflict between that VE or VS evidence and information

provided in the DOT. In these situations, the adjudicator will:

> Ask the VE or VS if the evidence he or she has provided
> conflicts with information provided in the DOT; and

> If the VE's or VS's evidence appears to conflict with the DOT,
> the adjudicator will obtain a reasonable explanation for the
> apparent conflict.

SSR 00-4P (S.S.A. Dec. 4, 2000). Here, at Step 5, the ALJ stated:

"Pursuant to SSR 00-4p, the undersigned has determined that the vocational

expert's testimony is inconsistent with the information contained in the DOT

for the reasons [which are] cited above." (R. at 22.) At the hearing, there

was substantial colloquy between the ALJ, the VE and Plaintiff's counsel

regarding how the DOT does not present a surveillance monitor as a one-

handed job. (*See, i.e.,* R. at 63, 66, 71 & 77.) Among other things, the VE

testified:

> Well, here's the deal. Since there's been a tremendous increase,
> I'm looking at those jobs, those surveillance monitors and I'm
> precluding casinos, no gaming institutions and no Homeland
> Security because there is a lot more activity within those
> particular surveillance modes in terms of education required,

duties and data they have to enter and things that they have to observe and report, write about and enter in terms of keyboarding. I am talking about basically a very small percentage of the surveillance industry to begin with, which is why there were so few jobs mentioned, which is why this is as it is. If we are looking at jobs that pertain to Homeland Security and gaming institutions then we are . . . looking at more sophisticated training, we're looking at more data entry and of course we're looking at somebody that's going to require both hands to perform that job. But by and large I am looking again at a very small percentage of all those jobs that are security related.

(R. at 70-71.)

Plaintiff's argument that the VE's testimony fails to "trump" the DOT is unavailing.  In this regard, the regulation specifically provides:  "Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."  SSR 00-4P (S.S.A. Dec. 4, 2000).  The ALJ did so here.  In addition to the above-quoted explanation, which was elicited in cross-examination by Plaintiff's counsel, upon examination by the ALJ the VE testified that he would advise the Court of any conflict between the DOT and his testimony and the basis for such opinion.  (R. at 60-61.)  The VE also testified that the DOT does not present the surveillance monitor as a one-handed job, and he also explained that his testimony was based on his "observations in the labor

41

market." (R. at 66, 77.) Accordingly, the ALJ's written decision expressly notes, "[t]he vocational expert testified that this is based upon his observations in the labor market and not DOT." (R. at 22.)

Moreover, Plaintiff's contention that the ALJ was compelled to defer to the DOT, in lieu of the VE's opinion – and her reliance upon supporting cases from the Second, Seventh, and Eighth Circuits – is mistaken and misplaced. (DE 11 at 25-26.) In the *Sixth Circuit*, an ALJ "may" but need not defer to the DOT, and may instead rely upon the VE's testing. *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (noting various disclaimers contained within the DOT itself). As our Court of Appeals has expressly noted, an ALJ is "within his rights to rely solely on the vocational expert's testimony[,]" as "[t]he social security regulations do not require the Secretary or the expert to rely on classifications in the *Dictionary of Occupational Titles.*" *Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995) (citing 20 C.F.R. § 404.1566(d)). Indeed, this very regulation only requires that the ALJ "take notice" of the DOT, which he clearly did here. 20 C.F.R. § 404.1566(d)(1). Notably, the very next subsection in the regulation states that the ALJ "may use the services of a vocational expert" in determining "whether your work skills can be used in

42

other work and the specific occupations in which they can be used . . . ." 20 C.F.R. § 404.1566(e).

Finally, as occurred in *Barker*, the vocational expert here "was available for, and was subjected to, vigorous cross-examination by the plaintiff[,]" as to the discrepancies between his testimony and the DOT, which were "brought out and explored in detail in the administrative hearing[,]" *Barker*, 40 F.3d at 795, and, in the instant case, even acknowledged in the ALJ's decision. (R. at 22.) The credibility of the VE having been "fully probed at the hearing," it is "properly within the province of the ALJ to determine." *Id.* (citing *Sias v. Secretary of Health & Human Servs.,* 861 F.2d 475, 480 (6th Cir.1988)). Given the "substantial deference" to which his credibility findings are entitled on review in this regard, the Court "cannot say the ALJ clearly erred by accepting what the expert said." *Id.* (citing *King v. Heckler,* 742 F.2d 968, 974 (6th Cir. 1984)).

### 5.   The ALJ's RFC determination is supported by substantial evidence.

Finally, I note Plaintiff's generalized assertions that "the ALJ's RFC is not supported by substantial evidence[,]" and "the testimony given by the [VE] clearly support[s] a finding and determination that the plaintiff had significantly limited ability to work." (DE 11 at 9, 19.) These arguments appear to challenge the ALJ's the ALJ's Step 4 RFC finding.

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence. 20 C.F.R. §§ 404.1527(e), 416.927(e). "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). However, the burden of proof at the Step 4 RFC stage rests with the claimant. *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)

Plaintiff has failed to prove that the ALJ's RFC determination was not supported by substantial evidence. As noted above, the ALJ's Step 4 sedentary RFC finding included a host of exertional, postural, manipulative and environmental limitations (R. at 16-17), the ALJ properly assessed Plaintiff's credibility, and he properly weighed opinion evidence. Thus, the ALJ's conclusion that Plaintiff has the RFC to perform sedentary work, with its 13-some limitations, should stand.

44

In light of this, any challenge to the ALJ's justifiable use of this RFC in forming his hypothetical at Step 5 would likewise be unavailing. *Ealy v. Commissioner of Social Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."). Since the hypothetical posed to the VE does accurately portray Plaintiff's physical and mental impairments, the VE's testimony in response may serve as substantial evidence in support of a conclusion that Plaintiff can perform other work..

## II.    ORDER

In sum, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Plaintiff's motion for summary judgment and/or remand (DE 11) is **DENIED**, Defendant's motion for summary judgment (DE 13) is **GRANTED**, and the Commissioner of Social Security's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated: March 21, 2016   s/Anthony P. Patti
                        Anthony P. Patti
                        UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 21, 2016, electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti